### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN BERRY,** | : | **Civil No. 1:15-CV-169** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **MATTHEW KABACINSKI,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

This is an action brought by Steven Berry against Matthew Kabacinski, a Pennsylvania State Trooper, for malicious prosecution, false arrest, and false imprisonment, all relating to Kabacinski's 2013 investigation into a complaint by Berry's ex-wife who alleged that he had violated a Protection from Abuse ("PFA") Order that had been entered against him.  Kabacinski became involved in this matter on May 10, 2013, after he had been dispatched to the home of Joan Berry, whom he did not know, and was told by her that Steven Berry had violated the PFA after he sent her numerous text messages and approached her and physically contacted her at an event at their children's school.  Kabacinski took down the information that Ms. Berry provided, and later determined that Steven Berry had

1

previously pled guilty just two months earlier to violating a previous PFA Order. Kabacinski relayed the information that he had to the York County Assistant District Attorney, who in turn authorized the filing of charges against Berry for stalking, harassment and violation of the PFA Order.

Berry was arrested on May 10 and transported to detention at York County Prison, not by Kabacinski but by other officers who are not named in this litigation.[1] Berry was later brought before a Magisterial District Judge who held a preliminary hearing at which Joan Berry and Trooper Kabacinski testified. Following this hearing, the Magisterial District Judge found that there was probable cause to support the charges, and bound the plaintiff over for trial. Following this proceeding, Berry sought *habeas corpus* relief before the York County Court of Common Pleas, which denied the request following a hearing.

---

[1]   According to Berry, he was never given an opportunity to make bail on the new charges. Although Berry was questioned during a deposition about whether he was being held for violating the terms of his probationary sentence, he attested that he was jailed on the new charges alone. This dispute is not entirely cleared up in the parties' briefs or supporting papers. Although it is initially concerning that Mr. Berry believes that he was held without bail, or even a bail consideration, for nearly one full year while the new charges were eventually brought to trial or later resolved, whether or not Mr. Berry received appropriate bail consideration is not a matter before the Court in this action. We note simply some degree of confusion appears to surround this issue, although there is no apparent dispute that Mr. Berry was initially seen by a Magisterial District Judge and a Common Pleas Court Judge during which he challenged the validity of the charges. We note that there is no indication in the transcript that either party raised the issue of bail during the preliminary hearing before the Magisterial District Judge. (Doc. 33, Ex. 6.)

Before his trial on the charges, the plaintiff spent nearly one year in jail, during which time both his brother and mother died, and he suffered significant financial hardships, including the foreclosure of his home in Baltimore.  He was eventually brought to trial, after which he was acquitted of stalking and harassment.  The charge for violating the PFA Order was continued after Berry agreed to undergo a drug and alcohol evaluation and a mental health assessment and after he agreed to the entry of another PFA Order.  The charge for violating the PFA Order was withdrawn after Berry successfully completed these evaluations, and after entry of the new PFA Order.

Berry brought this action by filing a complaint in the United States District Court for the Eastern District of Pennsylvania on December 11, 2014.  (Doc. 1.) The case was subsequently transferred to this Court on January 26, 2015.  (Doc. 7.) The defendant answered the complaint on April 17, 2015.  (Doc. 14.)  Berry filed an amended complaint on May 26, 2015.  (Doc. 24.)  Defendant Kabacinski answered the new pleading on June 4, 2015.  (Doc. 26.)  Thereafter the parties consented to proceed before the undersigned (Doc. 27.), and engaged in a period of discovery into Berry's claims.  On January 21, 2016, the defendant moved for summary judgment on all of the plaintiff's claims, arguing that the plaintiff lacks factual support for his legal claims, and asserting that he is entitled to qualified immunity on the undisputed facts surrounding Berry's arrest and prosecution.

3

(Doc. 32.)  The motion is now fully briefed and ripe for disposition, and for the following reasons the motion will be granted.[2]

## II.   **BACKGROUND**

Steven Berry married Joan on July 11, 2011.  The couple has two daughters, and their marriage ended in divorce in 2014.  (Def. SMF ¶¶ 7-9.)  The marriage

---

[2]   The parties' briefing has been marked by some dispute, most notably by the defendant's motion to strike the plaintiff's response to the defendant's statement of undisputed material facts ("Def. SMF").  (Doc. 44.) The defendant charges that the plaintiff has peppered his responsive statement with impermissible explanations and reference to material that was never disclosed during discovery, or other material that does not bear upon the truthfulness of the factual assertions that have been made.  We do not find it necessary to strike the plaintiff's counterstatement, and will deny this motion to strike, although the defendant's explanation and argument regarding what the plaintiff has offered in an effort to dispute factual assertions is helpful to evaluating the pending motion for summary judgment.  In the end, the Court agrees that much of what Berry would have the Court rely upon to find disputed issues of fact are really efforts at misdirection, because they do not speak to the relevant issue of what Kabacinski did and learned as part of his investigation, or what he was told by Joan Berry, or what actually transpired during the multiple legal proceedings that followed the filing of charges against Steven Berry and his eventual arrest and prosecution.  However, because striking a pleading is viewed as a drastic remedy, such motions are "generally disfavored." Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1057 (5th Cir. 1982).  As one court has aptly observed:  "striking a party's pleadings is an extreme measure, and, as a result, . . .  '[m]otions to strike under Fed .R.Civ.P. 12(f) are viewed with disfavor and are infrequently granted.' Lunsford v. United States, 570 F.2d 221, 229 (8th Cir.1977) (citing 5 Wright & Miller, Federal Practice and Procedure. Civil § 1380 at 783 (1969)). See also Resolution Trust Corp. v. Gibson, 829 F.Supp. 1103, 1106 (W.D.Mo.1993); 2 James Wm. Moore et al., Moore's Federal Practice § 12.37[1] (3d ed. 2000)." Stanbury Law Firm v. I.R.S.,221 F.3d 1059, 1063 (8th Cir. 2000).  In practice, courts should exercise this discretion and strike pleadings only when those pleadings are both "redundant, immaterial, impertinent, or scandalous" and prejudicial to the opposing party.  Ruby v. Davis Foods, Inc. , 269 F.3d 818, 820 (7th Cir. 2001).  Therefore, we will deny this motion to strike. (Doc. 44.)

was fractious, and the parties' each sought PFA Orders against the other.  In March

2013, Steven Berry pled guilty to four counts of violating a PFA Order and, as a

result, received a sentence of 18 months' probation.  (*Id.* ¶¶10-12; Ex. 4.)

On May 10, 2013, Trooper Kabacinski was dispatched to Joan Berry's

home.  (*Id.* ¶ 13.)  Prior to this encounter, Kabacinski had never met Joan Berry.

Upon his arrival, Joan Berry told Kabacinski that she wanted to report a PFA

violation.  (*Id.* ¶¶ 15-16.)  As part of her statement, Ms. Berry told Kabacinski that

she had received multiple text messages from Steven Berry.  (*Id.* ¶ 17.)  She also

told Kabacinski that her ex-husband had been convicted of violating prior PFA

orders.  (*Id.* ¶ 18-19.)  According to Kabacinski, he also learned that Steven Berry

was not to attend an event at the school where one of the couple's daughters was a

student because Joan Berry was to be present at the May 9, 2013 event as well.

(*Id.*)  Berry told Kabacinski that Steven Berry attended the event despite the PFA

order, and that while there he tapped her on the shoulder and handed her flowers.[3]

(*Id.* ¶ 21.)

---

[3]   Berry seeks to interject a number of other facts that he alleges are true, although his support for those facts is somewhat unclear in the record he has made. Regardless of the veracity of these facts – including the assertion that Joan Berry was herself a violent person, who had PFA orders entered against her for hitting Steven Berry with a frying pan and chasing him with a brick, or that she was vindictive and untrustworthy – they ultimately are not relevant to determining whether there is any dispute in the record about what Joan Berry actually told Trooper Kabacinski.  Steven Berry concedes that he was not present at the time of Kabacinski's interview with Joan Berry, and he has not developed any other

After his meeting with Joan Berry concluded, Kabacinski returned to his station to complete a report and to look up information on Steven Berry.  (*Id.* ¶ 23.) During this part of his investigation, Kabacinski confirmed that Berry had a criminal record for prior PFA violations, and also confirmed that there was an extant PFA Order that prohibited Berry from coming into contact with Joan, except to facilitate visitation of the couple's children.  (*Id.* ¶ 24.)

Having received Joan Berry's report, and having confirmed that Berry had previously violated PFA Orders, and that he was currently the subject of a PFA Order that substantially restricted his ability to contact or be around Joan Berry, Kabacinski contacted the York County District Attorney's Office and after relaying the information that he had obtained, was advised by an Assistant District Attorney to file charges of stalking, harassment and violating the PFA Order that had been entered against him.  (*Id.* ¶ 25.)   Kabacinski did as authorized and directed by the prosecutor's office.  (*Id.* ¶ 26.)  These charges filed were based in part on the fact that the plaintiff had texted Joan Berry six times and also that he had "contacted the victim in person following conviction for PFA violation."  (*Id.* ¶

_____

evidence to dispute what Kabacinski attested Joan Berry told him when he met her in response to her complaint.  We are not disputing the truth of what Steven Berry alleges about Joan Berry, and her own prior violent outbursts.  To the extent it is true, which we presume for purposes of resolving the pending motion, it does in fact seem to be something that could be relevant to her own motivations or tendency for truthfulness.  However, these facts, even if true, do not create a triable issue of fact as to what Joan Berry actually told to Kabacinski during their meeting to discuss her complaint.

27, quoting Criminal Charges, Ex. 5.) After he filed the charges, Kabacinski clocked out of work at 3:00 PM on May 10, 2013. (*Id.* ¶ 28.) Steven Berry was arrested later that same day – but not by Trooper Kabacinski. (*Id.* ¶¶ 29-30.) Following his arrest, Berry was transported to detention by Trooper Brooks, who is not named as a defendant in this action. (*Id.* ¶ 31.) Because Berry was arrested while on probation for his prior convictions for violating other PFA orders, Berry was not afforded the opportunity for a bail hearing. (*Id.* ¶ 32.)

It was not until July 11, 2013, that Berry had a preliminary hearing on the charges against him. (*Id.* ¶ 33.) That hearing was conducted by a Magisterial District Judge, and Berry was represented by counsel. During the hearing, the court heard testimony from both Joan Berry and Trooper Kabacinski. Joan Berry testified that the plaintiff had contacted her by text message, and she testified that even though she had informed her ex-husband that she was attending the evening concert and that he should attend the earlier concert during the day, he came to the evening program anyway. Ms. Berry testified that when the evening performance had concluded, the plaintiff approached her, tapped her on the shoulder, and handed her flowers that he had brought for his daughter, telling her to give them to her. (Id. ¶¶ 34-37.)

Following the hearing, the Magisterial District Judge found on the record that after hearing about "the flower incident at the school," the testimony

"definitely substantiates one of the charges."  (Id. ¶ 38, and Prel. H'rg. N.T. at 18,

Ex. 6.)  The court further stated:

> It seems like definitely Mr. Berry is pushing the
> envelope, you know.  You're thinking in a position of his
> that he's been told with a PFA no contact you'd very
> careful not to cross that line, and it doesn't appear that
> he's doing that.  Definitely again the contact, the physical
> contact with the flowers at the school is definitely not
> allowed and a violation . . .  with having numerous
> contacts and knowing that he shouldn't be doing that and
> again the physical contact with the flowers, I'm going to
> allow these charges to be bound over for Common Pleas .
> . . I think, there's you know, prima faci[e] evidence to be
> able to do that today to bind these over.

(*Id.* ¶ 39, Prel. Hr'g N.T. at 18-19, Ex. 6.)  Thus, based on testimony that it heard,

the court concluded that there existed probable cause to support the charges filed.[4]

Following the preliminary hearing, in mid-July 2013, the plaintiff filed a

motion for habeas corpus relief.  (Def. SMF ¶ 40 and Ex. 7.)  The plaintiff drafted

the motion himself, and in the motion acknowledged that he had pled guilty just a

---

[4]  Notably, the Magisterial District Judge appeared to have some concern that some
of the charges had very thin support in the record.  (*Id.*)  The court even seemed to
pause somewhat regarding the nature of the text messages, acknowledging that
although he understood that there were six in total he did not have access to the
text messages themselves.  In the end, based on the prior conduct and the
testimony, the court found that there was at least "prima facie" evidence to bind the
charges over, but he expressed his optimism that the Commonwealth would be able
to subpoena phone company records so the matter could be reviewed "fairly
easily" by the Court of Common Pleas.  (*Id.*)  It appears that the Magisterial
District Judge anticipated that this matter would admit of resolution well before it
did, as in the end Mr. Berry wound up spending nearly a year in prison on two
charges of which he was acquitted, and a third that was withdrawn.

few months earlier to violating an earlier PFA that had been entered against him. (*Id.* ¶ 41 and Ex. 7.)  In the petition, Berry admitted that he had been sentenced to 18 months of probation for that violation.  (*Id.* ¶ 41 and Ex. 7.)  Nevertheless, Berry argued that there was no probable cause to support the latest charges, and he maintained that Joan Berry was lying.  (*Id.* ¶ 43 and Ex. 7.)  Judge Gregory M. Snyder of the York County Court of Common Pleas convened a hearing on the petition, at which the plaintiff was represented by counsel.  (*Id.* ¶ 44.)  During that hearing, Judge Snyder observed that "we also have the Defendant approaching the alleged victim, the mother of these children, from behind, tapping her on the shoulder and handing her flowers."  (*Id.* ¶ 45 and Ex. 8, Habeas Order at 1-2.)  Based upon this finding, Judge Snyder found:

> I think if you take all of those things together, given the history between these two, if the jury were to believe all of the evidence presented by the Commonwealth and by their argument, that would be sufficient to make a prima facie case . . . . [T]hat's all we need to bind this case over for trial . . . . Therefore, we deny the relief requested by the Defendant in his habeas corpus motion and bind all counts over for trial.

(Def. SMF ¶ 45 and Ex. 8, Habeas Order at 2.)  At this point in the plaintiff's criminal proceedings, two separate judicial officers had found, following hearings and argument, that there existed probable cause to believe that Berry had committed the violations charged.

The plaintiff was tried in the spring of 2014, and on April 1, 2014, he was acquitted of the stalking and harassment charges.  (Def. SMF ¶ 46.)  By court order, the charge for violating the PFA Order was continued pending Berry's completion of a drug and alcohol program and mental health evaluation.  The same order also required that Berry would comply with "all recommendations" that came out of these evaluations, and also provided that Berry would not contest the entry of a Pennsylvania PFA Order.  (*Id.* ¶ 48 and Ex. 10, Order to Continue.)  Thereafter, the plaintiff successfully completed the drug and alcohol program and a PFA Order was entered against him, after which the charges for violating the prior PFA were withdrawn.  (Def. SMF ¶¶ 49-51.)  According to Berry's deposition testimony, what followed an initially hasty and incomplete criminal investigation resulted in him spending nearly a full year in prison, during which time he suffered the loss of his mother and brother, and incurred substantial financial costs, including a home foreclosure, because he was incarcerated.

Thereafter, the plaintiff initiated this action against Trooper Kabacinski, alleging that he did a shoddy investigation into Joan Berry's complaint and filed baseless charges that constituted a malicious prosecution.  He also alleges that Kabacinski is liable for false arrest and false imprisonment, for his role in causing the charges to be filed against Berry without sufficient probable cause.  Berry maintains that if Kabacinski had conducted a more thorough investigation, which

would have revealed numerous instances of Joan Berry's prior bad conduct and tendency for mendacity, he would have had reason to doubt her version of the events that led to the charges being filed.

## III.   **DISCUSSION**

### A.    **Summary Judgment Standard**

The defendants have moved for judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." *Univac Dental Co. v. Dentsply Int'l, Inc.*, 702 F. Supp. 2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. *Anderson*, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252*; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.,* 486 F.3d 791, 794 (3d Cir. 2007).

### B.     Trooper Kabacinski is Entitled to Summary Judgment on the Plaintiff's Claim for Malicious Prosecution

Berry first alleges that Trooper Kabacinski is liable for malicious prosecution for his role in conducting an extremely limited investigation into Joan Berry's allegations, and the filing of criminal charges against Berry for what the plaintiff contends was simply a misunderstanding between him and his ex-wife. Berry notes that Kabacinski did nothing more than to interview, and believe, Joan Berry's version of the events, and to determine that Berry had recently been convicted of violating another PFA, for which he received a probationary sentence that he was then currently serving.  We do not find that Berry has come forward with evidence to show sufficient disputed issues of material fact exist that could permit this claim to proceed past summary judgment.

The plaintiff brings his claims for malicious prosecution, false arrest, and false imprisonment pursuant to 42 U.S.C. § 1983.  In order to state a claim under § 1983, "a plaintiff must allege the violation of aright secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *Harvey v. Plaints Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

With respect to the malicious prosecution claim, Berry alleges that Trooper Kabacinski's actions violated the plaintiff's rights under the Fourth Amendment to the United States Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and now Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.  Under the Fourth Amendment, a prosecution undertaken or arrest made without probable cause is a constitutional violation that may be redressed under 42 U.S.C. § 1983.  *See Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) (malicious prosecution); *Walmsley v. Philadelphia*, 872 F.2d 546, 551 (3d Cir. 1989) (citing *Patzig v. O'Neill*, 577 F.2d 841, 848 (3d Cir. 1978) (false arrest).

To prove malicious prosecution under § 1983, a plaintiff must establish the following elements:  (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.  *Marasco*, 318 F.3d at 521.

14

For purposes of the second element, that the criminal proceeding have ended in the plaintiff's favor, the Third Circuit Court of Appeals has instructed that for a malicious prosecution claim to lie, the underlying criminal proceedings must have *entirely* terminated in the plaintiff's favor. *Kossler v. Crisanti*, 564 F.3d 181, 186-87 (3d Cir. 2009). This means that "a malicious prosecution claim cannot be predicated on an underlying criminal proceeding which terminated in a manner not indicative of the innocence of the accused." *Id.* at 187; *see also Heck v. Humphrey*, 512 U.S. 477, 484 (1994) (holding that the purpose of the favorable termination rule is to avoid "the possibility of the claimant succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction."); *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) (holding that a prior criminal case must have been disposed of in a manner that indicates the innocence of the accused in order to satisfy the favorable termination element).

This requirement that a plaintiff demonstrate that a prior criminal proceeding ended in its entirety in a manner that demonstrates his actual innocence of the charges thus precludes a malicious prosecution claim even where the underlying proceedings were expunged as part of an accelerated rehabilitative program (ARD), which the Third Circuit has held is not a favorable termination because

such a program "imposes several burdens upon the criminal defendant not consistent with innocence." *Gilles v. Davis*, 427 F.3d 197, 211 (3d Cir. 2005). Although the Third Circuit has cautioned that it may not be necessary for a plaintiff to be acquitted of all charges in order to satisfy the favorable termination element of a malicious prosecution claim, it has also held that a partial acquittal will not satisfy the favorable termination rule if the acquitted charges arose out of the same conduct for which the plaintiff was convicted on a different charge. *Kossler*, 564 F.3d at 192.  This is because when a plaintiff is acquitted of certain charges but convicted of others arising out of the same general course of conduct, this disposition does not "indicate the plaintiff's innocence of the misconduct underlying the offenses charged." *Id.* at 188.

This focus on the entirety of the underlying criminal proceeding, and the requirement that a plaintiff establish a disposition of the underlying charges in a way that demonstrates actual innocence, is relevant in this case.  The plaintiff was acquitted of the most serious charges of stalking and harassment, but the charge for violation of the PFA Order was continued by the prosecutor as part of an agreement struck with the plaintiff that required him to undergo drug and alcohol counseling, a mental health evaluation, and to consent to the entry of a new PFA order against him.  There is no question from reviewing the record that all three of the charges brought against Steven Berry arose out of the same discrete conduct,

and indeed the same set of circumstances surrounding his attendance at a school event, his multiple text messages to Joan Berry, and the claim that he approached and touched her at that school function. The question is whether the negotiated withdrawal of the charge for violating the PFA Order indicated that the proceeding terminated in his favor. We find that it does not.

As an initial matter, the mere fact that a prosecutor elects to withdraw charges, or seeks the grant of a *nolle prosequi* as to certain charges, does not in and of itself satisfy the favorable termination rule. *Donahue*, 280 F.3d at 383 ("[W]hile 'a grant of *nolle prosequi* can be sufficient to establish the favorable termination requirement for malicious persecution, not all cases where the prosecutor abandons criminal charges are considered to have terminated favorably.'") (quoting *Hilfirty v. Shipman*, 91 F.3d 573, 579-80 (3d Cir. 1996)). Instead, "it is sufficient only when the circumstances '*indicate the innocence of the accused.*'" *Tighe v. Purchase*, No. 1:11-CV-224, 2014 WL 3058434, at * (W.D. Pa. July 7, 2014) (quoting *Donahue*, 280 F.3d at 383) (emphasis in *Tighe*). Thus, for example, a *nolle prosequi* does not necessarily indicate the innocence of the accused where a district attorney has entered into a compromise agreement with the defendant, whereas a *nolle prosequi* entered when a prosecutor lacks sufficient evidence would do so. *Donahue*, 280 F.3d at 383.

The Third Circuit has held that a plaintiff's placement into an ARD program is not a favorable termination, even though it may result in the expungement of the plaintiff's arrest record, because "the ARD program imposes several burdens upon the criminal defendant not consistent with innocence[.]"  *Gilles*, 427 F.3 at 211. Those "burdens" include "restitution . . . imposition of costs, and imposition of a reasonable charge relating to the expense of administering the programs."  *Id.* at 197.  Accordingly, it is clear that in this circuit, a defendant's agreement to enter into a negotiated resolution of the criminal charges against him by agreeing to enroll in ARD will check-mate a future malicious prosecution claim regarding the charges. *Id.*

Following *Gilles*, another district court from within the Third Circuit concluded that the resolution of a charge for disorderly conduct that was *nolle prossed* pursuant to a negotiated agreement with the defendant foreclosed a later malicious prosecution claim because "there [we]re no facts suggesting that [the prosecutor] *nolle prossed* the charge because Plaintiff was innocent."  *Tighe*, 2014 WL 3058434, at *15.  Additionally, the court noted that the Commonwealth had reserved the right to reinstate the charge if the plaintiff in that case failed to comply with the terms of the compromise agreement, something that court found "hardly suggests that [the prosecutor] believed plaintiff was innocent."  *Id.*

18

We find that the *Gilles*, *Hilfirty* and *Donahue* decisions essentially foreclose the plaintiff's claims here, and our finding is bolstered by the district court's decision in *Tighe*, where charges were withdrawn as part of a negotiated resolution that did not reflect or even imply the defendant's actual innocence of the charges.[5] We recognize that the plaintiff was acquitted of the two most serious charges for stalking and harassment, and that the third charge for violating the PFA Order was withdrawn after the plaintiff honored his agreement to participate in a mental health evaluation and receive drug and alcohol counseling, as well as consent to the entry of a new PFA Order against him. However, the plaintiff has not adduced – and, on the undisputed record, is unable to adduce – facts that could suggest that he was actually innocent of violating the PFA. What the record shows is that this charge was withdrawn only because the plaintiff held up his end of a negotiated bargain by participating in counseling and a mental health evaluation, and consenting to the entry of a new PFA Order. The undisputed facts thus demonstrate that the plaintiff is unable to show that the criminal proceeding that

---

[5] We also note that in *Kossler*, the Third Circuit explained that district courts faced with claims for malicious prosecution may elect to analyze and, if appropriate, dispose of such claims based upon the favorable termination requirement. 564 F.3d at 194 ("We reiterate that district courts need not reach the probable cause element unless they first make a finding of favorable termination after examining whether the proceeding as a whole indicates the innocence of the accused with respect to the conduct underlying all of the charges.)

was initiated against him terminated in his favor, and, therefore, his claim for malicious prosecution fails as a matter of law.

### C. Trooper Kabacinski is Entitled to Summary Judgment on the Plaintiff's Claim for False Arrest and False Imprisonment

We similarly find that Trooper Kabacinski is entitled to summary judgment on Berry's claim that he was subjected to a false arrest or false imprisonment, which are distinct from a claim for malicious prosecution. In general, "[t]he torts of false arrest and false imprisonment are essentially the same actions." *Tarlecki v. Mercy Fitzgerald Hosp.*, No. Civ. A. 01-1347, 2002 WL 1566668, at *3 (E.D. July 15, 2002) (citing *Olender v. Twp. Of Bensalem*, 32 F. Supp. 2d 775, 791 (E.D. Pa. 1999)). A false imprisonment claim brought under 42 U.S.C. § 1983 is grounded in the Fourteenth Amendment protection against deprivations of liberty without due process of law. *Baker v. McCollan*, 443 U.S. 137, 142 (1979); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995). A false imprisonment claim, which is based on an arrest made without probable cause, is also based on the Fourth Amendment's guaranty against unreasonable seizures. *Groman*, 47 F.3d at 636; *Barna v. City of Perth Amboy*, 42 f.3d 809, 820 (3d Cir. 1994). The claims are "generally analyzed together." *Brockington v. City of Phila.*, 354 F. Supp. 2d 563, 570 n.8 (E.D. Pa. 2005).[6]

---

[6] "A claim for false arrest, unlike a claim for malicious prosecution, covers damages only for the time of detention until the issuance of process or

In order to prevail on a claim for false arrest, a plaintiff must demonstrate that police officers lacked probable cause to arrest him.  Thus, "[t]he proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Groman v. Twp. Of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (quoting *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988)).  Stated differently, "an arrest [that was] based on probable cause [can] not become the source of a claim for false imprisonment." *Id.* at 636 (citing *Baker v. McCollan*, 443 U.S. 137, 142 (1979)). Furthermore, as long as probable cause existed to support any single offense that could have been charged, an arrest will be deemed to have been supported by probable cause. *Barna*, 42 F.3d at 819.

Probable cause, in turn, exists if there is a "fair probability" that the person committed the crime at issue. *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000). "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to

---

arraignment, and not more." *Montgomery v. De Simone*, 159 F.3d 120, 126 (3d Cir. 1998); see also id. at 128-29 (Roth, J., dissenting) ("[A] false arrest claim, in which a person may have been illegally arrested though guilty of the prosecuted offense, is very different from a malicious prosecution claim where the propriety of the prosecution itself depends on it being initiated with probable cause.").

be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995).  A police officer thus may be liable for civil damages if "no reasonable competent officer" would conclude that probable cause existed.  *Wilson*, 212 F.3d at 789-90 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In general, the Third Circuit Court of Appeals has viewed "the question of probable cause in a section 1983 damage suit [as] one for the jury." *De Simone*, 159 F.3d at 124; *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir 1978).  However, a district court may conclude in the appropriate case that probable cause did exist as a matter of law if the evidence, viewed most favorably to plaintiff, reasonably would not support a contrary factual finding.  *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003).

Furthermore, we note that "an arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability for false arrest."  *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000) (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).  Rather, in such cases a plaintiff may prevail in a § 1983 action for false arrest or false imprisonment made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence:  (1) that the police officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant," and (2)

that "such statements or omissions are material, or necessary, to the finding of probable cause." *Id.*

In this case, the plaintiff has not come forward with any evidence to show that Trooper Kabacinski knowingly or deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood in seeking to have Steven Berry charged and arrested.  And other than to seek to reargue that Joan Berry was an untrustworthy source and that Trooper Kabacinski should have done more to determine the veracity of her complaint, Berry has really not come forward with evidence in support of his false arrest claim.  The evidence shows simply that Joan Berry made a complaint about her ex-husband violating a PFA Order, and Trooper Kabacinski was the law enforcement officer who responded to that complaint.  In so doing, he interviewed Joan Berry, confirmed that Steven Berry had sent her multiple text messages on the day in question, and learned that he was currently on probation for violating a prior PFA Order.  This evidence, standing alone, is sufficient for probable cause, which was the conclusion reached by the Magisterial District Judge who arraigned Berry on the charges, and by Judge Snyder on the Court of Common Pleas who also considered the information during the hearing that was held on Berry's motion for *habeas corpus* relief. Furthermore, it seems entirely undisputed that Berry violated the strict terms of the PFA order when he engaged in brief physical contact with his ex-wife, a violation

23

that as the state courts noted was particularly problematic given Berry's past history of PFA violations and the fact that he was on probation for violating a prior PFA order at the time of this incident.

Notably, Berry does not really dispute many of these facts so much as he argues that they do not tell the whole story; and he acknowledges that Joan Berry and Trooper Kabacinski testified at the preliminary hearing that followed his arrest, after which an independent judicial officer found that probable cause existed to support the charges.  Rather than dispute these facts, Berry tries instead to argue that Trooper Kabacinski effectively mislead the prosecutor and the court by failing to dig deeper into Joan Berry's background, which would have revealed her own prior misconduct and suggest a penchant for dishonesty and even vindictiveness. At bottom, Berry argues that Trooper Kabacinski did an inadequate investigation prior to contacting the District Attorney's Office to seek guidance about what charges should be filed, and he charges that Trooper Kabacinski conducted a negligent investigation into Joan Berry's complaint.  But even if Berry could prove by a preponderance of the evidence that Trooper Kabacinski's investigation was unreasonably limited, or even negligent, that would not support a claim for false arrest or false imprisonment since "negligent police work, even if proven, does not violate the due process clause."  *Wilson v. Russo*, 212 F.3d 781, 783 n.1 (3d Cir. 2000); *see also Orsatti*, 71 F.3d at 484 ("[T]he issue is not whether the information

on which police officers base their request for an arrest warrant resulted from a professionally executed investigation; rather, the issue is whether that information would warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.").

It also would not alter the immutable fact that Berry's physical contact with his estranged wife—contact which took place at a time when Berry had previously been convicted of PFA violations and was on probation for a prior PFA violation conviction--violated the literal terms of the outstanding PFA order that had been lodged against him at the time of this episode.  Therefore, notwithstanding Berry's misgivings about his ex-wife's motives and credibility, it seems uncontested that he had physical contact with her of a type which was not authorized under the PFA order.  It is this action by Berry, and apparent violation of the strict terms of a PFA order, albeit one that was not motivated by malice, which set in motion the chain of events that led to Berry's prosecution and, ultimately, this lawsuit.

While Berry's failure to abide by the literal terms of this PFA order is what led to this prosecution, we are not unmindful that Steven Berry was arrested on charges of which he was largely later acquitted, and that before that occurred, he endured nearly a year in prison and suffered much attendant hardship.[7]   These

---

[7] We also note again the confusion that exists with respect to which charges Berry was actually being held on for 11 ½ months, since there is some suggestion that Berry was incarcerated for violating the terms

circumstances are unfortunate and regrettable, but may have been largely avoidable through the exercise of some greater measure of restraint by Berry, restraint that was called forgiven Berry's pending probation for violating a PFA order.  We are also mindful that Steven Berry raised a number of serious issues with respect to Joan Berry, her own checkered past and subsequent circumstances that the plaintiff claims resulted in him being awarded sole custody of the couple's youngest daughter.  It is possible that these or other similar facts might have been relevant to a prosecutor or judicial officer, but they do not undermine the fact that probable cause existed for at least some of the charges for which Berry was arrested based simply on Joan Berry's report, the confirmation of multiple text messages that Berry sent, confirmation of his past violations of PFA Orders and current probationary sentence for such violations, and the fact that Berry was at that time under significant restrictions as the result of a new PFA Order.

Berry makes an impassioned argument that Trooper Kabacinski should have done more; what he has not done is to show that Kabacinski withheld material information as part of seeking guidance from the prosecutor about the charges to be filed, or in testimony at Berry's criminal proceedings.  Berry has, in the end, made a modest showing that Kabacinski could have done more before he contacted the prosecutor's office to seek guidance.  However, he has not suggested that

---

of his probationary sentence.  Regardless, Berry was confined for nearly a year before either being acquitted or having charges withdrawn.

Kabacinski lied or omitted information, and he has not come forward with sufficient evidence to show that probable cause did not exist, which we find was sufficiently supported, and which two judges similarly found in the course of Berry's criminal proceedings.

### D.    Trooper Kabacinski is Entitled to Qualified Immunity

However, even if we were to find that Berry had managed to develop some evidence to create a triable issue with respect to whether probable cause existed for at least one of the crimes for which he was arrested, we would nevertheless find that Trooper Kabacinski is entitled to qualified immunity from Berry's false arrest and false imprisonment claims.

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir. 2005).  In accordance with this doctrine, government officials will be immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly

27

established" at the time of the objectionable conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in consideration of the circumstances presented by the particular case at hand. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009).

"The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. This inquiry "must be undertaken in light of the specific context of the case." Id. at 201. Accordingly, "to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010).

At the time of plaintiff's arrest, it was clearly established that an arrest could be made only on the basis of probable cause. *Kelly*, 622 F.3d at 256. We have found, even taking the evidence in the light most favorable to Berry, that probable cause existed and that such a determination may properly be made from the record evidence in this case. But there is an additional reason why we find that, under the circumstances of this particular case, Trooper Kabacinski is entitled to qualified

immunity:  he sought the guidance of the York County District Attorney before filing any charges, and before other officers were dispatched to arrest Steven Berry based on Trooper Kabacinski's investigation.

The United States Court of Appeals for the Third Circuit has addressed the question of whether a police officer's reliance upon the legal advice of a district attorney prior to making an arrest cloaks the officer with qualified immunity.  In *Kelly*, the Third Circuit "reject[ed] the notion that a police officer's decision to contact a prosecutor for legal advice [prior to making an arrest] is *per se* objectively reasonable."  622 F.3d at 255.  At the same time, the appeals court acknowledged "the virtue in encouraging police, when in doubt, to seek the advice of counsel."  *Id.*  After surveying other courts' treatment of this question, the Third Circuit held that "encouraging police to seek legal advice serves such a salutary purpose" that it constitutes a "'thumb on the scale'" in favor of qualified immunity.  Id.  Therefore, the court held that "a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause."  *Id.* at 255-56.

At the same time, however, the Court instructed that an officer's reliance on such legal advice "must itself be objectively reasonable . . . because 'a wave of the prosecutor's wand cannot magically transform an unreasonable probable cause

determination into a reasonable one.'" *Id.* at 256 (quoting *Cox v.Hainey*, 391 F.3d 25, 34 (1st Cir. 2004)).   Therefore, a plaintiff may rebut the presumption that an arrest was based upon probable cause "by showing that, under all the factual and legal circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice." *Id.*

In this case, we do not find that Steven Berry has rebutted this presumption, and he has offered scant legal support for his contention that qualified immunity is unavailable here.   Indeed, he misperceives the reach of qualified immunity in federal court when he asserts, without citation, that qualified immunity should only be given to police officers when they are in danger or under exigent circumstances. (Doc. 38, at 13.)   Berry is simply wrong about the availability of qualified immunity for law enforcement officers like Trooper Kabacinski, and he fails to perceive that the law recognizes that an officer in Trooper Kabacinski's position who contacts a prosecutor for guidance prior to bringing charges, and who relies in good faith on that guidance, will be presumptively entitled to qualified immunity. Nothing in the record suggests that Trooper Kabacinski acted in anything other than good faith when he called the District Attorney's Office to report what he had learned during his investigation, and when he acted on the advice of a prosecutor who offered professional judgment about the charges that should be filed.   We believe that this precisely the kind of case that the Third Circuit anticipated in

*Kelly*, where qualified immunity should be granted, and Berry's inability to adduce evidence to discredit Trooper Kabacinski's investigation or good-faith reliance upon the advice of a prosecutor prior to bringing charges now compels judgment in the defendant's favor.

Indeed, the reasonableness of the legal advice that the trooper received from the Assistant District Attorney is underscored by the fact that two different state court judges also agreed following evidentiary hearings that probable cause existed to file these charges. In this setting, where the trooper followed the guidance of the prosecutor, and the state courts twice agreed that this guidance was sound, we cannot say that Trooper Kabacinski should have known that his actions transgressed clearly established constitutional norms. Therefore, the defendant is entitled to qualified immunity from damages.

## IV.   CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment will be granted.  An Order consistent with this Memorandum shall issue separately.


*/s/  Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

31